TEXAS EASTERN TRANSMISSION CORPORATION, Appellant,

v.

SEALY INDEPENDENT SCHOOL DISTRICT et al., Appellees.

No. 17129.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Feb. 1, 1979.

Rehearing Denied March 22, 1979.

Vinson & Elkins, David T. Hedges, Jr., Glen A. Rosenbaum, Houston, for appellant.

Conner, Odom & Clover, C. E. Clover, Jr., Sealy, Elvin E. Tackett, Bedford, for appellees.

Before COLEMAN, C. J., and PEDEN and EVANS, JJ.

COLEMAN, Chief Justice.

This is a suit by appellant, Texas Eastern Transmission Corp., hereinafter referred to as "Texas Eastern", against Sealy Independent School District, R. L. Dittert, individually and as Tax Assessor-Collector for Sealy Independent School District, Melvin Meier, Leroy Zapalac and Delmer Tipp, each individually and in their capacities as members of the Board of Equalization of the Sealy Independent School District, hereinafter referred to as "Sealy". Texas Eastern sued for an injunction and a writ of mandamus to prevent Sealy from imposing and collecting ad valorem taxes for 1977 based on the valuations set by the Board of Equalization. The trial was to the court after which a judgment was rendered upholding the valuation of the Board of Equalization and denying all relief to Texas Eastern.

Texas Eastern owns 12.22 miles of 24-inch natural gas pipeline in the Sealy Independent School District. This segment of line was constructed in 1953 as part of a line running from Provident City, Texas to Castor, Louisiana. The Provident City-Castor line is an integral part of Texas Eastern's Interstate natural gas transmission system that runs from Texas to the East Coast.

From 1953 through 1975, Sealy used the "Texas Schedule" to assess the value of the Texas Eastern Sealy line for ad valorem tax purposes. The Texas Schedule is an average life schedule which has been widely used in Texas for valuing pipelines. In 1977, Texas Eastern duly rendered the Sealy line at the value reflected on the Texas Schedule. After a hearing before the Sealy Independent School District Board of Equalization, this value was rejected by the Board, as was the net book value, (original) cost less depreciation of the line, $192,764.00, which Texas Eastern urged was its true fair market value. The Board set the value of the line at $511,310.00, a figure

corresponding to the valuation determined by use of a pipeline schedule prepared by Mr. B. E. Bledsoe of the Pritchard & Abbot appraisal firm, which had been hired by the Sealy Independent School District to appraise pipeline properties.

The trial court filed findings of fact and conclusions of law, including a finding that the fair market value of plaintiff's pipeline located within the Sealy Independent School District is not less than $511,308.00.

Texas Eastern asserts that the judgment of the trial court should be reversed because (1) Federal Power Commission regulation of the Sealy line operates as a matter of law to limit its fair market value to the sum of $192,764.00; (2) the $511,310.00 value placed on the Sealy line by the Sealy Independent School District is grossly excessive and was determined in an arbitrary and fundamentally erroneous manner.

■ The Texas Constitution, Article VIII, requires property to be taxed in proportion to fair cash market value. Fair cash market value has been defined as the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying. *Tenneco, Inc. v. Polk County*, 546 S.W.2d 63 (Tex.Civ.App. Beaumont-1970, rev'd on other grounds, *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918 (Tex.1977).

The controversy between the parties in this case is centered on the question of the market value of Texas Eastern's pipelines. The resolution of this issue is complicated by the fact that segments of pipeline such as the ones in question are rarely sold and market value cannot be determined by comparing the prices brought by sale of similar properties.

The issue is further complicated by the fact that the pipelines are regulated by the Federal Power Commission, which must approve any sales made of pipelines used in the interstate transmission of natural gas. The commission also sets the maximum rate which can be charged consumers by Texas Eastern, a factor affecting the income approach to value which is commonly used by appraisers.

Two methods for appraising the value of interstate gas transmission lines have been approved by the Supreme Court of Texas. These two methods are the cost approach to value and the income approach to value. *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918 (Tex.1977).

"The cost approach to value assumes that an informed purchaser of the property would pay no more than the cost of constructing a like property with the same usefulness as the property to be valued. . . . In using this method, the appraiser first estimates the cost of reproducing or replacing the subject property; he then subtracts accumulated depreciation and adds estimated land value to arrive at his value estimate. The method is usually a secondary approach to valuation and tends to set the upper limit of true market value." *Polk County v. Tenneco, Inc., supra.*

The Supreme Court then stated that the income approach to value proceeds on the premise that a buyer of income producing property is primarily interested in the income which it will generate. This approach involves estimating the future income of the property and applying a capitalization rate to that income to determine the market value. The capitalization rate is the rate of interest investors require as a return on their money before they would invest in the income producing property, taking into account all the risk involved in that particular enterprise. The Supreme Court stated: "[t]he income approach thus involves an estimate of two variables, future income and the capitalization rate, which are used to find the market value figure. The more precisely variables are estimated, the more accurate the market estimate will be." *Polk County v. Tenneco, Inc., supra.*

The tax schedule prepared by Ed Bledsoe was devised by determining the replacement cost for pipeline constructed by six major Federal Power Commission regulated pipelines and by studying the income of these pipeline companies. The two approaches were then combined and an aver-

age cost per mile for pipeline of equivalent diameter was calculated. The Bledsoe schedule shows that the average value of a mile of 24 inch pipeline constructed as of January 1, 1977, was $150,795.00. Since the pipeline in question was constructed in 1953 and the schedule allows 3% annual depreciation over the 24 year life span of pipeline, a value of $42,222.00 was placed on the pipeline on a per mile basis. This value was multiplied by 12.11 miles, the length of appellant's pipeline in the Sealy district to arrive at a fair market value of $511,310.00.

Mr. Bledsoe testified at trial that in making his appraisal he considered the three accepted methods of appraisal, cost approach, income approach and market data approach. The market data approach was not used as he did not feel that there were enough sales on which to base an appraisal. Bledsoe testified at the trial that in making his appraisal using the cost approach he acquired data from the Oil and Gas Journal in order to obtain the cost figures of pipeline construction and based on his cost on a comparatively low grade of pipe in order to be conservative in his approach, he determined that the cost per mile of 24 inch outside diameter pipeline as of January 1, 1977, was $174,509.00. He then allowed depreciation on that figure at the rate of 3% per year, straight line depreciation, back to the date of construction. Since Texas Eastern's line was constructed in 1953 and was 23 years old at the time of the appraisal, a total of 69% of the value of the line had been depreciated, resulting in a value per mile of $54,098.00. The 12.11 miles of line was estimated to have a total appraised value of $565,129.00.

In constructing his schedule, Mr. Bledsoe analyzed income data from six major Federal Power Commission regulated class-A natural gas transmission companies and arrived at a value figure based on income for each mile of 24 inch pipeline for those six companies. By then averaging the value of the pipeline properties of the six companies based on income, he determined one of the factors that he used in his overall appraisal.

In his testimony Bledsoe explained the procedure which he used in developing this factor. First he calculated the net utility plant as a percent of total fixed assets. He then determined the portion of capitalization attributable to the utility plant only. From the income statement of the six pipelines studied he calculated the percentage of cost of preferred stock, long term debt and equity. He then reduced all of the pipelines in each utility system to a common denominator of inch miles. The composite cost was then calculated by multiplying the percentage of preferred stock, long term debt and equity by the percentage of cost of each to determine the capitalization rate. The net income after taxes was then divided by the capitalization rate to determine value. The income value for each inch mile of pipeline was computed taking into consideration only the pipeline portion of the utility plant. This income value was adjusted for both future growth in equity and by the variance in 1975 between the Federal Power Commission rate of return on equity and the company's actual rate of return. The inch mile value was then used to obtain a value for the average size of the line per mile. After Bledsoe obtained an average replacement cost figure for pipeline of the six representative companies and the average income value of these companies, he added the two average values together and divided by two thus arriving at the value figure giving equal weight to the replacement cost and income approaches to value. The value is expressed in his schedule in dollars per inch of outside diameter of pipe per mile of pipeline. Mr. Bledsoe testified that at the time he constructed his schedule and made the original appraisal he did not have the income data for Texas Eastern that he had for the six representative companies. During the course of this litigation this information was made available to him. By applying the income approach to this data he determined that the Sealy line had a value of $126,111.00 per mile and a total value of $1,527,204.00. Using the data supplied by Texas Eastern and following the same cost approach procedure as he had used in developing the schedule, Mr. Bledsoe found that the total value of

the pipeline located in the school district would be $6,055,127.00. He testified that his appraisal of Texas Eastern pipeline located in the school district based solely on the data furnished by Texas Eastern resulted in a fair market value greater than that reflected by his appraisal based on the schedule. He testified that that schedule was designed to reach conservative values and in the Texas Eastern case resulted in a figure representing 67% of fair market value.

Texas Eastern relies on a statement made by the Supreme Court in *Pope County v. Tenneco, supra,* reading:

"If the average investor would be willing to accept a rate of return lower than the FPC-allowed rate of return then he would be willing to pay more for the pipeline than its net book value. If the investor required a greater rate of return then he would offer less than net book value for the property. Only if the capitalization rate were equal to the FPC-allowed rate of return would the income approach estimate of market value be equal to the net book value of the property. Since there was no such showing below, we cannot equate the two."

Texas Eastern produced testimony which is summarized. The net book value of the pipeline is the rate base on which the Federal Power Commission calculates the rates that interstate natural gas pipeline companies, such as Texas Eastern, may charge for their gas and services. The FPC sets the rate of return permitted a regulated pipeline and the depreciation rate with respect to its properties. This rate of return applied to the rate base determines what the pipeline may earn. The FPC allowed Texas Eastern a 12% rate of return on common equity as of January 1, 1977. The purchaser of Texas Eastern's Sealy line would inherit the Texas Eastern book value for rate purposes and thus would be permitted to earn on the same earnings base as Texas Eastern. A potential purchaser of the Sealy pipeline would demand a rate of return on his money that would be equal to or greater than the 12% rate of return allowed

Texas Eastern by the FPC. Texas Eastern asserts that since the minimum return demanded by an investor would be 12%, which equals the FPC-allowed rate of return on the Sealy line, and since he could earn only on Texas Eastern's rate base (net book value), the investor would pay no more than net book value.

Mr. Howard Shaw of the engineering department of Texas Eastern testified that Provident City-Castor line, of which the Sealy line is a part, is an integral part of the overall Texas Eastern Gas Transmission System and is one of the connecting lines between certain supply areas in the system and certain sales and exchange areas. Texas Eastern would need the permission of the Federal Power Commission to abandon any purchase or supply commitments that require the transmission of gas through the line. It will need to maintain the line in service to accomplish these services.

Texas Eastern asserts, therefore, that whether owned by Texas Eastern or a subsequent purchaser, the Sealy line will continue in use for interstate gas transmission purposes and will be subject to regulation by the Federal Power Commission. It asserts that the impact of such regulations must be taken into account in evaluating the line.

Mr. Robert O. Johnson is the supervisor of the ad valorem tax department for Texas Eastern within the State of Texas. He identified plaintiff's exhibit number 6 as representing the status of the 24 inch Provident City-Castor line within the State of Texas. He testified that the figures on this exhibit were derived from the books and records of Texas Eastern and that these books and records reflect that Texas Eastern has 245.35 miles of pipeline in Texas. The exhibit reflects that the original investment on the Provident City-Castor line within the State of Texas as shown by the work order for the construction of the line was $15,000,000.00. The exhibit reflects that the present 100% value of the pipeline within the Sealy Independent School District is $192,764.00. He testified that this figure was developed by taking a pro-rata

share of the pipeline investment in the State of Texas. From that pro-rated figure was deducted the applicable depreciation which was a pro-rata share of the sum of $618,510.00 depreciation allowed by Federal Power Commission.

Mr. O. D. Thigpen, as assistant controller for Texas Eastern, also testified with reference to plaintiff's exhibit number 6. He testified that the investment figure was the original cost in 1953 of that portion of pipeline constructed within the State of Texas. He testified that depreciation was not recorded in the books as such and had to be calculated based on month end or year averages on the property in service using the FPC depreciation rate. He testified that the applicable depreciation was deducted from the original investment and the cost of property additions made subsequent to 1953 within the school district were added. The figure for additions was arrived at by taking 80% of the cost of the additions shown by the books and records to have been made within Austin County on the basis that 80% of the line within that County was in the school district. The company records are not kept by taxing jurisdictions and the value of the line within a particular taxing jurisdiction was a figure based on the appropriate percentage of the total value of the line. He testified that depreciation was figured on the rate permitted by the Federal Power Commission, which was 3.3% annually up to 1974 at which time the rate was increased to 4.3%. In September 1975, the depreciation rate was increased to 4.4%. He testified that unless there was a large infusion of investment into that portion of the line located within the school district the net book value of that portion of the line would reach zero in about four years. Mr. Thigpen testified that the total investment in the Provident City-Castor line as shown by its books on December 31, 1976, is approximately $17,000,000.00. The figure includes about $2,000,000.00 representing additions to the line which he did not feel were attributable to the property within the Sealy Independent School District.

Mr. Richard M. Hawkins, the manager of gas rates for Texas Eastern, qualified as an expert on the rules and regulations of the Federal Power Commission and the procedure established by that commission for rates applicable to interstate gas transmission lines. He testified that the portion of Texas Eastern's gas line running through the Sealy School District is in interstate gas transmission service and is regulated by the Federal Power Commission. Approval is required before an interstate natural gas pipeline can be constructed or can be abandoned. He testified that using the figure of $192,764.00 as the value of the net gas plant, he determined that the company earned the sum of $18,139.00 on that section of the pipeline in the school district. By applying the commission allowed rate of return (9.41%) he then deducted the percentage of the earnings necessary to finance the long term debt and preferred stock and arrived at a figure of $8,964.00 as earnings to the holders of Texas Eastern common equity. This figure represents a return to equity of 12.5%. He testified that the rate of return prescribed by the Federal Power Commission is a maximum. If the company earns less than that figure its recourse is to request a higher rate. If it earns more than the allowed rate, the commission can require a new hearing. The rate set at the new hearing would be prospective and no refund would be required. He testified that a purchaser of all or a part of the transmission lines would be permitted to include in the rate base only the original cost to the person who first dedicated those facilities to natural gas service. His experience before the Federal Power Commission led him to the opinion that the commission would not permit a raise in rates to consumers based on the fact that a new purchaser of a transmission line paid an amount in excess of the net book value for the line.

Mr. Hawkins testified that the rate base included components other than the depreciated net book value of the property. Among other things the rate base includes the accumulated reserve for depreciation, which consists of the depreciation allowed

on those facilities during the entire time they have been in service. Other components include working capital, operating materials and supplies, and advance payments for gas. In determining the return on equity which can be attributed to the gas line in the Sealy School District Mr. Hawkins considered only the original cost less the accumulated reserve for depreciation and did not include in the rate base any portion of the working capital or other components included in the rate base for the company as a whole since he did not consider that these components were applicable.

Mr. Hawkins testified that when that portion of the line located in the Sealy School District is depreciated down to zero there would be no earnings on that portion of the line. However, Texas Eastern would not attempt to dispose of that portion of the line because it is a necessary part of their system. He testified that the diminishing rate base was a matter of concern to him as an employee of Texas Eastern involved in rate making and that he was concerned as to what the Federal Power Commission is going to do with reference to the depreciated rate base. The research and development, advance payments and prepayments, operations materials and depreciation forming a part of the rate base are just as much an integral part of the system as is the 12.11 mile line in the Sealy District. He testified that he hoped that the commission would come up with a new formula for figuring the rate of return. During the years 1968 through 1972 Texas Eastern's return to equity was in excess of 12.25%.

Paul C. Wright testified at the request of Texas Eastern and qualified as an expert witness. He is employed as a project manager with Pipeline Technologists. Previously he had been an independent consulting engineer. He has a Bachelor of Science degree in petroleum engineering from Texas A & M. He manages projects, and his duties include the design of pipelines, the cost estimates, estimates of capital cost, estimating the operating cost and the supervision of construction of pipelines. He testi-

fied that he was familiar with the Federal Power Commission's regulatory scheme for interstate gas pipelines and that he had appeared before the Federal Power Commission as a witness on several occasions. He has engaged in technical conferences with the staff and had assisted attorneys in the presentation of applications to the commission. He has appraised natural gas transmission facilities.

Mr. Wright testified that the net book value of the segment of the Texas Eastern pipeline located in the Sealy Independent School District was $192,764.00, which was the original cost less depreciation and that this figure was a good starting point for an opinion of the market value of a regulated pipeline. The fair market value of the line is affected by the fact that it is regulated by the Federal Power Commission. The earnings which could be realized on a pipeline would be a very important factor for consideration by a purchaser. The rate base, the rate of return, and the depreciation allowed are all determined by the Federal Power Commission. He testified that the rate base goes with the property. The rate base consists of the gas plant in service less accumulated depreciation in this particular case. The other components of the rate base would not apply to this line.

Mr. Wright testified that if the property in question were purchased at the Pritchard & Abbot appraisal of $511,310.00, and if the same capital structure now in existence was continued by the purchaser, the earnings would be calculated on the net book value and the return would be 9.41%, as allowed by the Federal Power Commission. On that basis the earnings would be $18,139.00, which would not be sufficient to pay the pro-rated share of the interest on the long term debt. It was his opinion that no reasonable investor would pay $511,310.00 for that portion of Texas Eastern Line. He testified that in his opinion 12% would be the lowest return to equity an investor would accept. He testified that he knew of a recent instance where an investor wanted a 20% return on his equity. He did not know, however, what return an investor

received on corporate bonds at this time. Mr. Wright also estimated the original cost of that line based on historical data found in the Oil and Gas Journal. He estimated the original cost to be $847,700.00, and, using a 30 year life for the pipeline, he depreciated it by the straight line method and found the depreciated value to be $170,218.00. This figure was somewhat lower than Texas Eastern's net book value so that in making his estimate of the fair market value he determined to use the Texas Eastern net book value figure. It was his opinion that an investor would be willing to pay substantially more for an unregulated line than for a line regulated by the Federal Power Commission. In determining the fair market value by the cost approach he depreciated the 1953 cost while Mr. Bledsoe in his evaluation on the cost approach method depreciated the 1977 cost. He does not consider the Bledsoe approach a valid way to reach the market value of a Federal Power Commission regulated pipeline. Mr. Wright testified that in determining what a fair market value would be he looked at the facts from the standpoint of what a willing purchaser would pay for the pipeline and the price a willing seller would demand. It was his opinion that Texas Eastern would not sell for less than the net book value and a willing buyer would not pay more than the net book value.

Mr. Wright testified that even though the property value of a section of pipeline might reach zero because of depreciation, it would be needed in the business and would have a value as an integral part of the entire system. In his income approach to the market value he took a proportionate part of the net income of the gross utility plant and then projected his depreciation schedule over about 13 years and came up with a number of dollars of income per year for those years. He then discounted the cash flow to arrive at the present value of that future income. He testified that he did not agree with the figures given by Mr. Thigpen on depreciation and that it was his opinion that the section of pipeline would reach economic obsolescence in about 13 years. He testified that the fair market

value of the pipeline is not necessarily the net book value of the pipeline. He did not know whether the purchaser of a section of pipeline could also purchase the depreciation referable to that line. In determining the value of a section of pipeline it would be useful to consider the effect of that section of the line on the earnings of the total system.

Mr. Wright testified that his original estimate of the net book value of the pipeline in the school district was done on a cost basis. This was close enough to net book value for him to proceed on that basis. As he got more information he tested the results obtained on the cost basis by going to the income basis and other factors. These were merely tests to see if the market value was a fair market value. In that context he looked at the income of the company and arrived at a proportion of that income which might be attributed to the Sealy School District section. When the fair market value calculated on that basis turned out to be must less than fair market value calculated on the cost basis he "sort of dropped it". While considering the income approach he projected a decline of earnings over the next 13 years. However, he used the income approach not as an appraisal tool, but as a tool to test the validity of his cost approach. One reason that he did not rely on the income approach is the fact that he predicted a decline in the gas reserves. He had no idea how fast the reserves were declining and it would take a lengthy detailed study to determine this factor. It was his opinion that based on present operations and his rate of decline, in about thirteen years there would be no more "business" in that pipeline, but there would be some very nominal value in the pipeline.

■ The burden rested on Texas Eastern to prove that the Board of Equalization adopted an illegal, arbitrary and fundamentally erroneous plan of valuation, or placed a grossly excessive valuation on Texas Eastern's pipeline. *Polk County v. Tenneco, Inc., supra*; *State v. Whittenburg*, 153 Tex. 205, 265 S.W.2d 569 (1954).

The controversy between the parties is centered on the question of the market value of Texas Eastern's pipelines. The issue of fair market value is one of fact. Whether the Board adopted an arbitrary and fundamentally erroneous plan or scheme of valuation, and whether the value set by the board is grossly excessive, are questions of law. *Polk County v. Tenneco, Inc., supra.*

A question before this court is whether or not the valuation placed on the pipeline by the Board of Equalization is grossly excessive. Texas Eastern also contends that the Board of Equalization reached its valuation of the pipeline segment in an arbitrary and fundamentally erroneous manner. The Board determined the valuation to be placed on the property after hearing expert testimony. The valuation was primarily based on the testimony of Mr. Bledsoe, which in turn was based upon his schedule.

The fact that Mr. Bledsoe's testimony was based upon the schedule as applied to this particular section of pipeline does not destroy its probative value. Since the Board of Equalization determined fair market value from testimony of expert witnesses based on recognized apprisal procedures, we cannot say that the valuation was determined in an arbitrary and fundamentally erroneous manner prohibited by law.

In *Texas Electric Service Co. v. Wheeler,* 551 S.W.2d 341 (Tex.1977), it was held that the testimony of an expert witness as to land values had probative value despite the lack of supportive market data.

In *Polk County v. Tenneco, Inc., supra,* the Supreme Court discussed the probative value of the testimony of Mr. Bledsoe based upon his schedule, and declined to hold that the opinions were based upon methodologies or figures so inaccurate as to render those opinions legally insufficient evidence of value.

The burden was on Texas Eastern to establish that the assessed value is so far above the fair cash market value as to shock a correct mind and thereby raise a presumption that the valuation was fraudulent or does not represent a fair and conscientious effort on the part of the board to arrive at the fair cash market value. There is a distinction between an excessive valuation and a grossly excessive valuation. *City of Waco v. Conlee Seed Co.,* 449 S.W.2d 29 (Tex.1969).

We are unable to agree that as a matter of law the net book value of the Sealy pipeline as determined by Texas Eastern necessarily constitutes the fair cash market value of the line. In the willing seller-willing buyer test of market value it is frequently said that all factors should be considered which would reasonably be given weight in negotiations between a seller and a buyer. *City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808 (1954). It has also been stated that to use one particular element as the sole standard by which to fix the value of real property is fundamentally wrong. *Rowland v. City of Tyler,* 5 S.W.2d 756 (Tex.Comm.App.1928).

Mr. Bledsoe testified that in constructing his schedule he gave weight to the fact that the line was regulated by the Federal Power Commission. He considered there was no law which prevented the line from being put to a non-regulated use by a purchaser. The evidence established that it is highly unlikely that the line could be removed from use as an interstate carrier of natural gas. Purely speculative uses to which a property might be adaptable but wholly unavailable should not be considered as factors which would reasonably be given weight in negotiations between a seller and a buyer. *City of Austin v. Cannizzo, supra.* Mr. Wright testified that in determining the fair market value by the cost approach he depreciated the 1953 cost rather than the cost of reproducing or replacing the subject property. His testimony reflects that while he used the income approach to check his opinions of the value of the property, on final analysis he based his valuation primarily on his opinion that a willing seller would not sell for less than the net book value and a willing buyer would not pay more than the net book value because the line was regulated by the Federal Power Commission.

Mr. Bledsoe testified that in the income approach to the value of the property he used the historical cost of credit to Texas Eastern averaging 10.83% as a proper capitalization rate rather than using the figure of 12% which Mr. Wright testified an investor would require as of January 1, 1977. Mr. Bledsoe's opinion that the income to Texas Eastern would increase over the next five years is reflected in the figure for income which he capitalized to reach market value. It was Mr. Wright's opinion that the income from the property would decrease over the next several years and his estimate of value based on the income approach was affected by that opinion. It was undisputed that the property would have a value after full depreciation for rate making purposes, but there was a dispute between the witnesses as to whether this value would significantly affect a prospective purchaser. It is undisputed that this section of pipeline would have little value except as a component of a pipeline system. It may well be that if this section of pipeline was needed to operate the system a purchaser might give it a greater value than would be justified by its ability to earn in a regulated industry.

The record reflects that the depreciation allowed by the Federal Power Commission will result in a zero basis prior to the expiration of the useful life of the pipeline. Since accumulated depreciation is factored into the rate base, a purchaser might require its inclusion in the sale resulting in a higher purchase price.

In *Polk County v. Tenneco, Inc., supra,* the Supreme Court recognized that the income approach involves an estimate of two variables, future income and the capitalization rate and that the more precisely the variables are estimated, the more accurate the market value estimate will be. A number of matters were developed in the testimony casting doubt on Bledsoe's expertise and the weight to be given his opinion. His opinion as to fair market value was based in part on cost approach and in part on the income approach to value. The trial court was not bound to accept the exact values reached by either of the expert witnesses.

Mr. Bledsoe attached little significance to the fact that the income derived from the operation of a pipeline is regulated by the Federal Power Commission. He explained that a purchaser might devote the line to an unregulated use and that the rules and regulations of the Commission were subject to change so that the excess of the purchase price over the depreciated cost might be recovered by its inclusion in the rate base at a future time or by an increase in the rate of return. These matters are speculative. There is no evidence suggesting that the section of pipeline under consideration is likely to be more valuable for a different use in the future, or that the Federal Power Commission's rules and regulations are likely to be revised. The evidence is to the contrary. A prospective purchaser undoubtedly would consider the limitations on income resulting from regulations by the Federal Power Commission in determining a reasonable price to pay for the line for use in interstate commerce. If the prospective purchaser desired to put the pipeline to another use, he would consider the necessity for permission of the Commission to abandon the line for transmission of natural gas in interstate commerce, and the uncertainty, delay and expense of securing such permission. These matters would enter into the decision as to price, but there is nothing to indicate that they were given significant consideration by Mr. Bledsoe or the trial court. Despite the fact that there was testimony that a capitalization rate of 12% was the minimum rate of return which a prospective purchaser would require and that 12% was the rate of return allowed by the Federal Power Commission, we do not agree that the net book value as testified to by the Texas Eastern witnesses equals fair market value. In *Polk County v. Tenneco, Inc., supra,* the net book value of the entire gas transmission system was established and "an allocation factor" applied to determine the percentage of the system located in the taxing unit and the value thereof.

Texas Eastern determined net book value by using the cost of the pipeline of which the segment in the taxing unit was a part

plus replacement costs on the part within the unit minus depreciation at the rate allowed by the Federal Power Commission.

It is unlikely that the two methods would produce the same value. The evidence suggests that a prospective purchaser would be required to purchase the entire system. An expert witness could properly reason that a fair method of determining net book value would be the percentage approach.

■ Mr. Bledsoe's testimony as to fair market value supports the finding made by the trial court. We consider Bledsoe's income approach to be an erroneous method of valuation because of his failure to consider the impact of the Federal Power Commission's Rules and Regulations on future income. If we disregard Mr. Bledsoe's testimony based on the income approach to value, there is insufficient evidence to sustain the finding of fair market value made by the trial court.

A point of error complaining of the factual sufficiency of the evidence is also presented. If Mr. Bledsoe's income approach testimony is not based on methodology so inaccurate as to render his opinion legally insufficient as evidence of value, the finding on fair market value would not be so contrary to the great weight and preponderance of the evidence as to be manifestly unjust.

In the absence of a determination of the fair market value of the property as a matter of law or by a finding of fact supported by sufficient evidence, we are unable to determine whether the valuation placed on the property by the Board of Equalization is grossly excessive. *City of Waco v. Conlee Seed Company*, 449 S.W.2d 29 (Tex.1969). Other points of error have been presented and, after careful consideration, are found not to present reversible error.

Reversed and remanded.

### On Motion for Rehearing

In its motion for rehearing Texas Eastern has pointed out certain mistakes and clerical errors in the recitation of the facts of this case. The opinion is corrected to reflect that Mr. Bledsoe testified that the total value of the pipeline located in the School District was $655,127.00; that the Texas Eastern Provident City-Castor line within the State of Texas is 246.35 miles in length; and that the return on equity to the holders of the Texas Eastern common stock as of January 1, 1977 was 12.25 percent.

The motion for rehearing filed by Texas Eastern and the motion for rehearing filed by Sealy Independent School District are denied.