Roy L. MARTIN, Appellant,

v.

CITY OF MESQUITE, Texas, et al., Appellees.

No. 20085.

Court of Civil Appeals of Texas, Dallas.

Nov. 14, 1979.

Rehearing Denied Dec. 20, 1979.

Edward Kliewer, III, Ronald B. King, Foster, Lewis, Langley, Gardner & Banack, Inc., San Antonio, for appellant.

Elland Archer, City Atty., Mesquite, for appellees.

Before GUITTARD, C. J., and CARVER and HUMPHREYS, JJ.

GUITTARD, Chief Justice.

The owner of approximately nine acres of land, on which a retail store is located, brought this suit attacking the city's assessment of his property for the year 1976. The trial court, sitting without a jury, denied relief, and the taxpayer appeals on the ground that the trial court erred in finding that the city had presented evidence before the board of equalization supporting its valuation and in holding that he had failed to establish that the value placed on his property was excessive. We find evidence to support the trial court's findings. Accordingly, we affirm.

The taxpayer contends that since he had filed a sworn rendition of this property stating a value less than that for which it was assessed and had appeared before the board of equalization to protest the city's valuation, the city had the burden under article 7212, Texas Revised Civil Statutes (Vernon Supp.1978–1979), to introduce competent evidence before the board but failed to do so. The city contends that article 7212 does not apply to cities, but that even if it does, competent evidence was presented. Without deciding whether article 7212 applies to cities, we hold that the board had before it evidence sufficient to support its valuation.

The record contains a court reporter's transcript of a portion of the proceedings before the board and also the testimony in court of the city tax assessor, Jerry Jones, who was present at the hearing before the board. Jones testified concerning his qualification as a tax assessor and appraiser, and no challenge is made to his qualification as an expert on valuation of property. He testified that at the beginning of the board hearing he presented to the board his tax assessment records, together with his affidavit that the values shown by the records were true and correct. These records, he said, were in the form of appraisal cards for the various properties assessed. The appraisal card for the property in question is in evidence. It gives a substantial amount of detailed information, including a diagram of the land and buildings, the amount and value of the land, the cost, size, characteristics, and condition of the improvements, and all changes made in valuation since 1962. This card shows the value to be $300,000 for the land and $782,000 for the improvements, making a total of $1,082,000.

The appraisal card, but not the tax assessor's affidavit, appears in the transcript of proceedings before the board. This transcript does not purport to include the complete hearing before the board, and apparently other property had been considered before this property was reached. The transcript does show that when the board came to consider the property in question, the assistant tax assessor, Joe Pondrom, made the following statement to the board:

What we have is the Woolco property belonging to Roy Martin & Associates. We've got $1,082,000.00 on land and buildings. Its value was established in 1970. And we have made no changes to it since that time.

Although this transcript does not show that Pondrom was under oath, Jones testified at the trial that Pondrom was sworn at the beginning of the hearing.

We conclude that this evidence is sufficient to support the board's valuation. It does not show, as the taxpayer argues, that the board had nothing before it except the personal knowledge of its members and the evidence offered by the taxpayer. Proceedings before boards of equalization are informal and quasi-judicial. *Warren Independent School District v. Southern Neches Corp.*, 404 S.W.2d 809 (Tex.1966). Such boards are not bound by the rules of evidence and are allowed a broad latitude in determining the value at which property is to be assessed for taxing purposes. *Pierce v. City of Jacksonville,* 403 S.W.2d 512, 518 (Tex.Civ.App.—Tyler 1966, writ ref'd n. r. e.). We know of no legal requirement that an expert opinion from an independent appraiser must be obtained when the city's own assessor is qualified to express an opinion on the value. Neither do we know of any authority establishing that the assessor's qualifications must be recited to the board, or that his valuation must be given orally rather than by written statement under oath, particularly if the assessor is present and available for cross-examination, as in this case.

We recognize that there is no evidence that the appraisal card or the assessor's affidavit was furnished to the taxpayer at the time of the hearing, but, presumably, both were public records available to the taxpayer before and during the hearing. In view of the assessor's testimony that the valuation on the card was supported by his affidavit and also by the sworn statement to the board by the assistant tax assessor, we find no failure to comply with article 7212 and no denial of due process. If the board's valuation, based on this evidence, is excessive, the taxpayer has his remedy, which he has invoked in this suit. We turn, therefore, to his contention that the court erred in holding that this valuation is not excessive.

In order to establish that the board's valuation is excessive, the taxpayer asserts that the board erred in disregarding the income approach to value and in basing its valuation of the building in question entirely on replacement cost. In this connection, he argues that at the trial the city offered no valuation testimony but that of its tax assessor, who based his testimony entirely on replacement cost and disregarded the rental income from the property under the terms of a long-term lease to. F. W. Woolworth Co., which, according to the taxpayer, provided a rental so low that no reasonable investor would willingly buy the property for the amount at which it was assessed.

We cannot agree that the trial court erred in finding that the valuation of $1,082,000 is fair and equitable. The tax assessor testified at length concerning his method of assessing the property. He said that he personally filled in the information on the appraisal card for the property in question. He estimated the market value of the land without the building at $300,-000, without considering the effect of the lease. He estimated the value of the building on the basis of replacement cost per square foot at $782,000, differentiating between the sales area, auto service area, and receiving or storage area. This figure, he said, was determined in 1970 according to costs prevailing at that time and the same valuation had been used for each succeeding year on the theory that any depreciation in the building was offset by a general increase in costs and appreciation in market value.

The assessor testified that he considered the income approach in valuing the property, but not the income from the current lease. Rather, he considered the property as if it were not leased and what it might have been leased for. He did not give the income approach any weight because the information provided by the landowner was

not adequate, since the lease had many variables and would require an appraiser to speculate.

The assessor testified that he was personally familiar with the property and had inspected it when the 1970 valuation was made, and again for the 1976 valuation. He estimated that the current reproduction cost of the improvements, without allowing for depreciation, was $1,800,000. He said that there was no physical depreciation other than normal wear and tear. He did not apply any depreciation to the 1970 reproduction cost figure because in his opinion the property had actually appreciated about twenty per cent. He used the cost approach because it would provide a more uniform valuation throughout the city than the income approach, which could not be used, for instance, in the case of residential property. In his opinion, use of the income approach for some property but not all would create inequities throughout the city. At one point the assessor testified that no willing buyer would have paid $1,082,000 for the property subject to the lease, but on further cross-examination, he retracted that statement and testified that the most a knowledgeable buyer would pay for the property on January 1, 1976, was "probably a million one."

The taxpayer presented the testimony of his leasing agent, who said that the property is subject to a lease to Woolworth in which the primary term extends until 1982 and the lessee has options to extend the term for another twenty-five years. The agent testified that the minimum annual rent stipulated in the lease is $130,000 per year, with a provision for additional rent based on a percentage of gross sales, but that the actual sales for the years in question do not bring the rental above the minimum and that the property has a "negative cash flow" in that the expenses of maintaining, insuring, and paying taxes exceeded the amount of the rent. He acknowledged that in the future the amount of sales might reach a point that the lessor would receive a percentage as well as the minimum rent. The agent was of the opinion, however, that a knowledgeable investor

would not buy the property for more than $800,000.

The taxpayer also presented the opinion of a professional appraiser, who testified that he had appraised the owner's interest in the property, subject to the lease, including the owner's right to future income and his reversionary rights, at approximately $700,000. He acknowledged that the physical property with improvements was worth more than that amount and that he would value it at a higher figure if it were not subject to the lease. He did not consider the replacement cost a significant method of determining market value subject to the lease, although he would consider it if there were no lease on the property.

 This evidence must be considered in the light of the applicable rules of law. The constitution requires taxation to be equal and uniform and that property be taxed in proportion to its value. Tex.Const. art. 8 § 1. "Value" as used in this section, has been interpreted to mean reasonable cash market value. *Rowland v. City of Tyler*, 5 S.W.2d 756, 760 (Tex.Comm'n App. 1928, judgmt. adopted). Determination of the exact market value each year of each piece of property within a county, city, or other taxing district is a task of staggering complexity. Consequently, courts have recognized that exact uniformity and equality is unattainable and have held that no attacks on valuations fixed by boards of equalization can or will be sustained in the absence of fraud, want of jurisdiction, illegality, or the adoption of an arbitrary and fundamentally erroneous plan or scheme of valuation. *State v. Whittenburg*, 153 Tex. 205, 265 S.W.2d 569, 572–73 (1954). Although a grossly excessive valuation may be sufficient to establish fraud or illegality, mere error in judgment, or the fact that a trial judge or jury differs with the valuation fixed, will not suffice as a basis for avoiding the board's action. *Id.* at 573. The burden is on the taxpayer to establish that the assessed value is so far above the cash market value as to shock a correct mind and raise a presumption that the valu-

ation is fraudulent or does not represent a fair and conscientious effort to arrive at the fair cash market value. *Texas Eastern Transmission Corp. v. Sealy Independent School District,* 580 S.W.2d 596, 604 (Tex. Civ.App.—Houston [1st Dist.] 1979, writ ref'd n. r. e.).

In the light of these principles, the evidence in this case does not establish as a matter of law that the valuation of $1,080,-000 is excessive. Certainly, it cannot be considered so grossly excessive as to establish fraud or illegality in view of the taxpayer's valuation of $700,000 to $800,000, and the well-known tendency of appraisers to differ. Moreover, the court's finding is supported by the assessor's testimony that the market value is probably as high as $1,100,000.

The taxpayer's principal argument is that the trial court erred in rejecting the income approach to value and in not taking into consideration the low rent provided in the lease. We cannot agree. If an income approach were adopted for this taxpayer, then every other owner of commercial property would be entitled to the same treatment. Yet to value commercial property solely according to its income has been held to be an erroneous method of valuation because long-term rental contracts made either in boom times or times of depression may be affected by bad business judgment and would not represent fair value to either the city or the taxpayer. *Rowland v. City of Tyler,* 5 S.W.2d 756, 760 (Tex.Comm'n App.1928, judgmt. adopted). We cannot adopt a rule that would require the tax assessor to examine the provisions of each commercial lease, calculate the rent under various contingencies, evaluate the taxpayer's claims of legitimate expenses, and apply a capitalization factor to determine market value. We hold, rather, that the trial court could properly accept the opinion of the tax assessor that such a method would make uniformity of valuation difficult, if not impossible, and that the only fair method is to value the property as the assessor valued it, namely, by estimating the market value of the land in the light of

sales of comparable property and adding the replacement cost of the improvements, determined on a uniform basis. Clearly, the taxpayer has failed to establish as a matter of law that this method of valuation is fundamentally erroneous.

Moreover, we conclude that the assessor's method of valuing the property as if it were not subject to a lease is not only permitted, but required by Texas law. The general rule, as stated in *Daugherty v. Thompson,* 71 Tex. 192, 9 S.W. 99, 101 (1888), is that the owner of real estate leased is taxed on the entire value of the property. *Accord Yadco, Inc. v. Yankton County,* 89 S.D. 651, 237 N.W.2d 665, 668–69 (1975). When the fee is exempt from taxation, leaseholds are expressly made taxable by articles 7173 and 7174, Tex.Rev.Civ.Stat. Ann. (Vernon Supp.1978–1979). Most leaseholds, however, are not taxable under existing law. *Irving Independent School District v. Delta Airlines, Inc.,* 534 S.W.2d 365, 368 (Tex.Civ.App.—Texarkana 1976, writ ref'd n. r. e.); Tex.Atty.Gen.Op. No. M–319 (1968). Consequently, to reduce the assessed value of property because of an unfavorable lease would allow property to escape taxation to the extent that the value of the leasehold estate exceeds the value of the lessor's right to payment of rent.

In *Daugherty v. Thompson, supra,* the Supreme Court expressly recognized that this general rule does not violate the constitutional requirement that all property be taxed in proportion to value. Since the terms of each lease are matters of contract, the ultimate tax burden is left to the process of bargaining between the parties. Any proper economic analysis of lease transactions must recognize that unless the tax burden is expressly shifted to the lessee, the rent is fixed with a view to the amount of taxes and other expenses of ownership. If a particular lease fails to specify a rental sufficient for this purpose, the lessor cannot be heard to complain that his taxes are for that reason excessive.

The taxpayer also attacks the board's valuation on the ground that the

board violated the Open Meetings Act, Tex. Rev.Civ.Stat.Ann. art. 6252–17 § 2 (Vernon Supp.1978–1979), by excluding the public from its deliberations. He bases this contention on the following statement made by a member of the board at the end of its hearing:

Gentlemen, we will render a decision this afternoon. We appreciate your coming and we will try to be as fair as possible. You will be notified as to our decision.

The trial court was justified in finding that this statement did not exclude anyone, but was merely an act of courtesy advising the parties that they would not be required to remain at the meeting place in order to learn the decision of the board. Consequently, no violation of the Open Meeting Act is shown.

Affirmed.