POLK COUNTY et al., Petitioners,

v.

TENNECO, INC., Respondent.

No. B–6278.

Supreme Court of Texas.

June 22, 1977.

As Corrected On Denial of Rehearing
July 20, 1977.

E. L. McClendon, Jr., Livingston, Elvin E. Tackett, Bedford, for petitioners.

Reynolds, White, Allen & Cook, Stanley B. Binion, Houston, for respondent.

GREENHILL, Chief Justice.

This tax suit was filed by Tenneco, Inc., against petitioners Polk County, the County Tax Assessor-Collector, and the County Board of Equalization. Tenneco sought, among other things, an injunction and a writ of mandamus to compel the defendants to set aside the 1975 ad valorem tax assessment of Tenneco's pipelines lying within Polk County. Trial was to the court, which rendered judgment that Tenneco take nothing. The court of civil appeals reversed that judgment and vacated the County's assessment of Tenneco's pipelines for the year 1975. 546 S.W.2d 63. We granted the writ of error because the court of civil appeals equated the net book value of the pipelines with the market value of the pipelines. It is our view that it erred in doing so; and accordingly, we reverse its judgment. The cause is remanded to that court for the consideration of points not heretofore ruled upon.

Tenneco, through its Tennessee Gas Pipeline Division, owns and operates an interstate natural gas transmission system. Underground gas pipelines make up a major part of this system, and portions of three of these pipelines are located in Polk County, Texas. These three pipelines run parallel through the county and total approximately 61.90 miles in length. Their size, age, location and original costs are undisputed, as is the fact that they comprise .198 percent of

the value of Tenneco's entire gas transmission system.

For the years 1970 through 1974, the county's tax plan was to tax property in the county on the basis of 17 percent of market value. During those years, Tenneco rendered its pipelines to the county at a value of $534,830. The county accepted these renditions and taxed the pipelines on that value, and Tenneco paid the taxes so levied without protest.

In 1975, the County Commissioners' Court decided to change the assessment ratio for the 1975 tax year. The court determined that property would be assessed at 25 percent, rather than 17 percent, of market value for county tax purposes. In order to increase the valuation of Tenneco's property to reflect the increased assessment ratio, the Commissioners' Court, sitting as the County Board of Equalization[1] [hereafter called the Board], multiplied Tenneco's 1975 rendition of $534,830 by a factor of 1.47. The result was an assessment of Tenneco's pipelines at $786,220 for the 1975 tax year.[2]

Upon learning of the Board's action, Tenneco instituted this direct attack by filing suit to set aside the increased assessment. The Board thereupon agreed to vacate its previous assessment and to reconvene and hear evidence on the market value of Tenneco's pipelines. The hearing was held, and both sides put on witnesses who gave their opinions of the pipelines' market value. After hearing the evidence, the Board unanimously agreed to assess the pipelines at $786,220. Tenneco then continued with this suit, which had been postponed pending the outcome of the Board hearing.

Articles 7211 and 7212 are the statutory bases for the authority of boards of equalization to increase renditions and to equalize assessments. Article 7211 provides that when an assessor has increased a taxpayer's rendition, and the taxpayer objects, the county commissioners' court "shall hear evidence and determine the true value of such property. . . ." Article 7212(A) authorizes boards of equalization to increase or diminish property valuations if satisfied that those valuations are not in accordance with the laws of the state. The statute further provides:

> [W]hen any assessor in this State shall have furnished the said Board with a rendition as provided for in the preceding Article it shall be the duty of such court to call before it such persons as in its judgment may know the market value or true value of such property as the case may be by proper process, who shall testify under oath the character, quality, quantity of such property as well as the value thereof. Said court after hearing the evidence shall fix the value of such property in accordance with the evidence so introduced and as provided in the preceding Article *and their action in such case or cases shall be final* . . . . [Emphasis added].

■ Because the statutory language is clear that valuations made by boards of equalization "shall be final," and because decisions made by the boards are quasi-judicial in nature, *Bernhardt v. Port Arthur Independent School District,* 159 Tex. 488, 324 S.W.2d 163 (1959), *State v. Houser,* 138 Tex. 28, 156 S.W.2d 968 (1941), the courts of this state will not set aside board valuations absent compelling circumstances. On the

---

1. *See* Tex.Rev.Civ.Stat.Ann. article 7206. All statutory references in this opinion are to Vernon's Annotated Texas Civil Statutes unless otherwise indicated.

2. We do not have before us the question of whether the use of fractional assessments by the county is consistent with Article 7174, which provides in relevant part: "In determining the true and full value of real and personal property the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation, . . . ." *See* Yudof, *The Property Tax in Texas Under*

*State and Federal Law,* 51–2 Texas L.Rev. 885, 898 (1973). Tenneco apparently chose not to make such an attack on the county's tax plan. The argument is not made in Tenneco's trial pleadings, nor was it briefed or presented to the court of civil appeals or to this court by point of error, cross point, or counter point. It is, therefore, unnecessary for us to express an opinion on the propriety of the county's use of fractional assessments; and this opinion should not be read as either approving or disapproving of the county's plan in that regard.

other hand, the boards do not possess absolute discretion in valuing property; they must follow both constitutional and statutory directives. *See, e. g.,* Article V, Sections 1 and 20 of the Texas Constitution, and Articles 7174 and 7212.

Perhaps the most quoted statement of these ideas is found in *State v. Whittenburg,* 153 Tex. 205, 265 S.W.2d 569 (1954). This Court there stated:

It is now well settled that the assessment of property for tax purposes is a quasi-judicial function of boards of equalization and that no attack on valuations fixed by such boards can or will be sustained in the absence of proof of fraud, want of jurisdiction, illegality, or the adoption of an arbitrary and fundamentally erroneous plan or scheme of valuation. [citing cases]. Moreover, when their official action is attacked it will be presumed that such boards discharged their duties as public agencies according to law and acted in good faith. [citing cases]. 265 S.W.2d at 572–73.

Tenneco, therefore, assumed a heavy burden in attempting to set aside the Board's valuation of the pipelines.[3]

The principal arguments made by Tenneco in the trial court were that the Board's assessment of the pipelines at $786,220 was grossly excessive and, alternatively, that the assessment was actually and substantially discriminatory because other property in the county was assessed at a lower percentage of market value.[4] The basis of both of these arguments was Tenneco's allegation that the market value of its pipelines in Polk County was $2,139,320. If that figure was accurate, then Tenneco's 1975 rendition of $534,830 was 25 percent of market value; and it was argued that the

Board's assessment of $786,220 was therefore "grossly excessive." Similarly, if Tenneco's market value figure was accurate, then the Board's assessment of $786,220 was approximately equal to 37 percent of market value. Since it was undisputed that the county's tax plan was to assess all taxable property in the county at 25 percent of market value, then Tenneco's property was argued to be subject to an unequal and discriminatory assessment ratio. The defendants, on the other hand, contended that the market value of Tenneco's pipelines was $3,144,880. If that was the true value, then the Board's valuation was neither grossly excessive nor unequal and discriminatory.

■ It is therefore evident that the controversy between the parties centered on the question of the market value of Tenneco's pipelines. When the question of market value is central to the taxpayer's claim, as here, that question is one of fact for the fact finder. The questions of gross excessiveness and of substantial discrimination, however, are ones of law for the court. The court must decide as a matter of law whether the assessment by the taxing authority was so excessive or so discriminatory as to warrant the setting aside of that assessment. *Cf. Whelan v. State,* 155 Tex. 14, 25, 282 S.W.2d 378, 385 (1955).

In this case, the questions of substantial discrimination and gross excessiveness were not briefed by the parties. We therefore decline to decide whether Tenneco would have been entitled to the relief sought even had it been able to prove its allegation that the market value of its Polk County pipelines was $2,139,320. In view of the disposition we make of this case, however, we believe it would be a pertinent inquiry by

---

3. For a critical examination of ad valorem tax suits in Texas and the sometimes insurmountable problems involved in those suits, *see* Yudof, *The Property Tax in Texas Under State and Federal Law,* 51–2 Texas L.Rev. 885–909 (1973). *See also* Comment, *Remedies Available to a Victim of Wrongful Ad Valorem Property Tax Assessment,* 33 Texas L.Rev. 1075 (1955).

4. Tenneco also alleged that the Board had adopted a fundamentally erroneous plan of assessment with no relation to market value by applying the 1.47 factor to Tenneco's renditions, that it had been discriminated against by the Board's intentional failure to revalue other properties in the county, and that it had been deprived of its asserted right to a hearing on the valuation question. *Cf. Zavala County v. E. D. K. Ranches, Inc.,* 544 S.W.2d 484 (Tex. Civ.App.1976, no writ).

the court of civil appeals on remand. In considering the question, the court may find helpful those cases which have involved allegedly unequal and discriminatory assessments, e. g., Bernhardt v. Port Arthur Independent School District, 159 Tex. 488, 324 S.W.2d 163 (1959), Dallas County v. Dallas National Bank, 142 Tex. 439, 179 S.W.2d 288 (1944); and those cases which have decided whether assessments in excess of market value were grossly excessive. See City of Waco v. Conlee Seed Co., 449 S.W.2d (Tex.1969) and cases cited therein.

The market value of Tenneco's pipelines was highly contested at trial, and it was not an easy question to resolve. Segments of natural gas pipelines, such as those which lie in Polk County, are rarely sold; and their market value therefore generally cannot be determined by comparing the prices brought by sales of similar properties. This fact makes the assessment of pipelines by the taxing authority a difficult task, because market value is defined as "the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it . . .." City of Austin v. Cannizzo, 153 Tex. 324, 334, 267 S.W.2d 808, 815 (1954). See also Article 7174, and State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194 (1936). Thus, the "comparable sales" method of appraising property is of little use in valuing pipelines; and two other methods of appraisal must be used in assessing those properties. These two methods are the cost approach to value and the income approach to value.

The cost approach to value assumes that an informed purchaser of the property would pay no more than the cost of constructing a like property with the same usefulness as the property to be valued. Real Estate Appraisal Terminology 53 (1975). In using this method, the appraiser first estimates the cost of reproducing or replacing the subject property; he then subtracts accumulated depreciation and adds estimated land value to arrive at his value estimate. The method is usually a secondary approach to valuation and tends to set the upper limit of true market value. E. Johnson, Cost Approach to Value, Encyclopedia of Real Estate Appraising 37 (1959).

The income approach to value, on the other hand, proceeds on the premise that a buyer of income-producing property is primarily interested in the income which his property will generate. In simple terms, the approach involves estimating the future income of the property and applying a capitalization rate to that income to determine market value. Comment, The Road to Uniformity in Real Estate Taxation: Valuation and Appeal, 124 U.Pa.L.Rev. 1418 (1976). The capitalization rate may be defined as the rate of interest investors would require as a return on their money before they would invest in the income-producing property, taking into account all the risks involved in that particular enterprise. Fisher, Capitalization Rates, 25 Nat'l Tax J. 263 (1972). See also Real Estate Appraisal Terminology 33, 34, 67 (1975). The income approach thus involves an estimate of two variables, future income and the capitalization rate, which are used to find the market value figure. The more precisely the variables are estimated, the more accurate the market value estimate will be. Conversely, if the variables used are inaccurate, then the resulting market value figure will also be incorrect.

At the trial, both Tenneco and the county put on witnesses who used the cost and income approaches to valuing the pipelines, and who testified in detail about the procedures and variables which have been discussed above. Tenneco's expert witness used both the cost and income approaches to determine the value of Tenneco's entire gas transmission system. The value he obtained by using the cost approach was $1,205,600,000. Under the income approach, the witness used a future income estimate of $116,105,000. By dividing this income figure by a capitalization rate of 11 percent, he arrived at a valuation of $1,055,500,000 for the entire system. Since he believed that the income approach was more accurate than the cost approach, he gave it

greater weight and valued the entire system at $1,100,000,000. Because the Tenneco pipelines lying in Polk County constituted .198 percent of the entire system, the value of the system was then multiplied by an "allocation factor" of .00198. The Tenneco witness thus concluded that the market value of the pipelines in Polk County was $2,178,000.

Polk County put on two value witnesses at the trial. The witness who testified as to the cost approach gave his opinion that the pipelines' value was $4,614,780. This opinion was based upon a schedule which he had prepared and which purported to give reconstruction costs for various sizes of pipelines. The witness had applied the schedule to each segment of Tenneco pipeline in the county and had then subtracted depreciation to arrive at his value estimate.

The county's witness who used the income approach was Mr. Edward Pritchard. His opinion of value was $3,116,585. Pritchard's estimate of the income to be capitalized was $119,626,522; and his opinion of the proper capitalization rate was 7.6 percent. Capitalization of the income therefore yielded a value for the entire system of $1,574,033,184. The portion of that value allocable to the pipelines lying in Polk County was .198 percent, or $3,116,585.

The trial court found as fact that the market value of Tenneco's pipelines in Polk County on January 1, 1975, was $3,144,880. Given this finding of value, the Board's assessment of the pipelines at $786,220 was neither excessive nor discriminatory; and the trial court rendered judgment that Tenneco take nothing.

Tenneco then appealed to the court of civil appeals on twenty-three points of error. Points nine and ten attacked the trial court's finding of value on factual and legal sufficiency of the evidence. The no evidence argument was that the testimony at trial which tended to support the trial court's finding of value was based upon an erroneous method of valuation, and that testimony therefore was legally insufficient to support the finding. The court of civil appeals agreed with Tenneco's argument and rendered judgment vacating the Board's assessment.

The court of civil appeals' opinion does not discuss the evidence put on by the county relating to the cost approach to value. The opinion does, however, discuss the county's evidence based on the income approach to value. The court noted that Pritchard, the county's valuation witness who based his opinion of value on the income approach, had used a capitalization rate of 7.6 percent. In order to test the sufficiency of that capitalization rate, the court applied it to the net book value of Tenneco's gas transmission system of $1,180,263,117. The court used this figure because it was undisputed at trial that net book value is the rate base on which the Federal Power Commission calculates the rates that interstate gas pipeline operators, such as Tennaco, may charge for their gas and services. If Tenneco were permitted a return of 7.6 percent on its net book value of $1,180,263,117, then it would have earned $89,699,997 in income. Because this income figure was insufficient to service Tenneco's debt and preferred stock dividend obligations, the court concluded that the capitalization rate used by Pritchard was inadequate and that his use of the income approach was erroneous. It therefore sustained Tenneco's no evidence point. Since there was no evidence to support the trial court finding of value, the court of civil appeals then apparently reasoned that Tenneco's evidence conclusively established the market value of the pipelines to be $2,178,-000. In reversing the trial court judgment and in vacating the Board's assessment of $786,220, the court implicitly concluded that that assessment was grossly excessive or substantially discriminatory, or both.

■ The county and other defendants applied for a writ of error on the ground that the court of civil appeals erred in its test of the capitalization rate. They argue that by applying the capitalization rate of 7.6 percent to net book value in order to find income, the court implicitly assumed that net book value is equal to fair market value, and that the court of civil appeals' holding was therefore erroneous. We agree.

Under the income approach to value, the future income of the property and the capitalization rate are estimated by the appraiser; and the value of the property is then determined by "capitalizing" the income estimate. In its test, the court of civil appeals estimated the value of the property and the capitalization rate to find income. Since the income figure thus produced was regarded as obviously inadequate, the court concluded that the capitalization rate was not valid. Logically, however, an equally reasonable explanation for the erroneous income figure produced by the test was that the *value* figure used by the court, that of net book value, was not accurate. By holding the capitalization rate to be invalid, however, the court implicitly held that the value estimate was accurate. Such a holding assumes the very question at issue in this case, that is, the market value of Tenneco's gas transmission system. The reasoning of the court of civil appeals, then, was erroneous unless the net book value of Tenneco's gas transmission system is equal to its market value. For the reasons discussed below, we hold that it is not.

The net book value figure used by the court of civil appeals is the accounting figure representing the original cost of Tenneco's pipeline division utility plant plus the value of construction work in progress, less depreciation, amortization and depletion. It was undisputed at trial that this figure was not equal to market value. Tenneco's expert testified a number of times that the net book figure was not necessarily equal to market value and that he did not contend that it was. The evidence showed that the net book value of the pipelines in Polk County was $842,798, but Tenneco contended the pipelines' market value was $2,178,-000. Given these facts, and the definition of market value in *City of Austin v. Cannizzo, supra,* we hold that the court of civil appeals erred in equating net book value with market value.

Tenneco attempts to justify the use of net book value because the Federal Power Commission [FPC] regulates the rates that interstate gas pipeline operators may charge for their gas. The evidence at trial was that the FPC, in setting these gas rates, determines the income which the utility will be allowed to earn. The permitted income is found by multiplying a "rate base" by a "rate of return" figure. The rate base used by the FPC is the *net book value* of the utility's gas transmission properties. The regulated utility's income thus equals the product of its net book value and the FPC-allowed rate of return. *See generally* American Gas Association, *Gas Rate Fundamentals* 214–226 (Rev.ed. 1969).

Tenneco argues that the court of civil appeals, therefore, properly multiplied Tenneco's net book value by Pritchard's capitalization rate to find the hypothetical income figure. We disagree. There was, no showing at trial that the capitalization rate is equal to the rate of return allowed by the FPC; and such a showing is necessary in order for Tenneco's argument to be valid. If the average investor would be willing to accept a rate of return lower than the FPC-allowed rate of return then he would be willing to pay more for the pipeline than its net book value. If the investor required a greater rate of return on his money than the FPC-allowed rate of return then he would offer less than net book value for the property. Only if the capitalization rate were equal to the FPC-allowed rate of return would the income approach estimate of market value be equal to the net book value of the property. Since there was no such showing below, we cannot equate the two.[5]

■ For the reasons set forth above, we have concluded the court of civil appeals erred in holding that the method of determining value used by the county's expert

5. We do not mean to suggest that the rates the FPC allows an interstate gas pipeline to charge do not *affect* the market value of that company. The permitted gas rates affect the utility's income, and income affects market value to the extent that an uncoerced purchaser considers income in deciding whether to purchase the company. We hold only that although a utility's income may be dependant on net book value, that does not mean that net book value *equals* market value.

witness was inadequate as a matter of law. After reviewing the record, we have concluded that there was evidence tending to support the trial court's factual determination of a market value of $3,144,880 for the pipelines. The county's two expert valuation witnesses gave their opinions of values of $3,116,585 and $4,614,780 respectively. Both witnesses were cross-examined extensively by Tenneco's counsel on the bases of their opinions, and it appears that the figures used by both witnesses were subject to question. For example, in applying the income approach, Pritchard's estimate of future income was equal to Tenneco's pipeline division's net operating income for 1974. Also, his capitalization rate was equal to the five-year average of the return on total capital in the nation's seven largest consolidated natural gas producers and pipeline operators. Further, the schedule used by the county's cost approach witness did not differentiate between oil pipelines and gas pipelines, between intrastate pipelines and interstate pipelines, or among different soil characteristics. The county's cost approach witness also declined to divulge the sources of information he used in compiling the schedule. These matters certainly reflect on the credibility of the county's expert witnesses and the weight to be given their opinions by the fact finder. However, we decline to hold that the experts' opinions were based upon methodologies or figures so inaccurate as to render those opinions legally insufficient evidence of value. The matters complained of by Tenneco go to the weight, rather than the propriety of, the evidence. *See Texas Electric Service Co. v. Wheeler,* 551 S.W.2d 341 (Tex.1977).

The judgment of the court of civil appeals therefore cannot stand on the basis of the previously discussed no evidence point. The court, however, did not consider the other points of error before it in reversing the trial court's judgment. Of these unconsidered points of error, it appears that eight complain of the factual sufficiency of trial court findings and are thus within the exclusive jurisdiction of the court of civil appeals. We have therefore decided to remand the cause so that the court of civil

appeals may review all of Tenneco's points that were not disposed of on the earlier appeal.

The judgment of the court of civil appeals is reversed and the cause is remanded to that court for further proceedings.