**CITY OF DALLAS, Texas, Appellant**

v.

**REDBIRD DEVELOPMENT CORPORATION, Appellee.**

No. 05–03–01155–CV.

Court of Appeals of Texas, Dallas.

Aug. 9, 2004.

Rehearing Overruled Sept. 21, 2004.

Madeleine B. Johnson, City Atty., Barbara E. Rosenberg and Denise A. Baldwin, Asst. City Attys., Dallas, for Appellant.

John D. Volney, Jeffrey M. Tillotson, Richard A. Smith, Lynn Tillotson & Pinker, L.L.P., and William M. Ravkind, Ravkind & Associates, Dallas, for Appellee.

Before Justices FITZGERALD, RICHTER, and LANG.

## OPINION

Opinion by Justice LANG.

This is an appeal by the City of Dallas (City) from an adverse jury verdict for $3 million in favor of Redbird Development Corporation (RDC) on RDC's breach of contract claim. First, the City urges us to conclude that the trial court erred in denying its plea to the jurisdiction which was based on its sovereign immunity. We are requested to decide that since the City was not subject to the jurisdiction of the trial court, the trial court's order denying the City's plea to the jurisdiction should be reversed and RDC's claims dismissed. RDC asserts that, pursuant to the Texas Supreme Court's decision in *Reata Construction Corp. v. City of Dallas,* —— S.W.3d ——, 47 Tex. Sup.Ct. J. 408, 2004 WL 726906 (Tex. Apr. 2, 2004) (per curiam) (mo. for reh'g filed), the City's initiation of its breach of lease claims against RDC waived sovereign immunity and paved the way for RDC to assert its counterclaim for breach of the same lease. Then, the City raises four other issues: (1) the evidence is legally and factually insufficient to support the award of $3 million in damages, and the damages are clearly ex-

cessive and unjust; (2) the trial court abused its discretion in severing another party, First Redbird Development Corporation (FRDC), from the suit; (3) the trial court abused its discretion in denying the City's motion to disqualify counsel for RDC, after counsel withdrew from representing FRDC; and (4) postjudgment interest should be reduced because a 2003 legislative amendment to section 304.003 of the finance code reducing the postjudgment interest rate applies here. For the reasons that follow, we reject the City's arguments and affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1994, RDC assumed an existing lease to Redbird Airport. Effective February 1999, the City and RDC negotiated a new lease for thirty years, at a lower rent. On October 1, 1999, the City terminated the lease and then sued RDC for unpaid rent and late charges. The City also named FRDC as a party. The City asserted that RDC and FRDC were the same corporation and, under an alter ego theory, each should be jointly and severally liable for the breach of the lease and wrongful conduct of the other. However, the trial court granted RDC's motion to sever the City's claims against FRDC. Then, the trial court denied the City's motion to disqualify RDC's attorneys, who had withdrawn from representing FRDC. Finally, RDC countersued the City for breach of contract for wrongfully terminating the lease.

The jury answered questions regarding the breach of contract claims and damages in favor of RDC. In the final judgment, RDC was awarded $3 million in damages, pre- and postjudgment interest, and costs, and it was ordered that the City take nothing. The trial court denied the City's motion for new trial, and this appeal followed.

## JURISDICTION

In its first issue, the City contends that the trial court erred in denying the City's plea to the jurisdiction because the City did not expressly or by conduct waive its immunity from suit for a breach of contract action. The City filed a plea to the jurisdiction after the final judgment. The City contends that RDC's claims should be dismissed for lack of subject matter jurisdiction because RDC brought a breach of contract claim against the City without demonstrating a basis for waiver of immunity from suit. In its response, among other bases for waiver of immunity from suit, RDC argued that the City waived immunity from suit by filing suit and litigating its claim. Without stating its reasons, the trial court denied the plea to the jurisdiction.

### Applicable Law and Standard of Review

■■■ Suing the State requires the plaintiff to prove the State's consent to the suit. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex.2002). Without the State's consent to suit, sovereign immunity defeats a court's subject matter jurisdiction. *Id.* Sovereign immunity extends to municipalities when they are carrying out governmental functions. *City of Galveston v. Posnainsky*, 62 Tex. 118, 127 (1884). A city functions in its governmental capacity when it performs functions mandated by the State. *Truong v. City of Houston*, 99 S.W.3d 204, 210 (Tex.App–Houston [1st Dist.] 2002, no pet.). The operation of a municipal airport is a governmental function. Tex. Transp. Code Ann. § 22.002(a)(2) (Vernon 1999).

■■■ A plea to the jurisdiction challenges a trial court's authority to decide the subject matter of a lawsuit. *Bland*

*Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). The lack of subject matter jurisdiction may be raised at any time. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443–44 (Tex.1993). Lack of subject matter jurisdiction renders a judgment void rather than merely voidable. *Mapco, Inc. v. Forrest,* 795 S.W.2d 700, 703 (Tex.1990) (orig.proceeding) (per curiam). A trial court's ruling on a plea to the trial court's subject matter jurisdiction is reviewed de novo. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex. 1998).

### Discussion

RDC argues that the Texas Supreme Court's recent opinion in *Reata Construction Corp.* dictates that the trial court's order denying the City's plea to the jurisdiction be affirmed. The City claims that the facts in *Reata* are distinguishable. Additionally, the City contends that even under the rule of law stated in *Reata,* RDC's counterclaim cannot be asserted because it is not "germane" to the claims which the City brought against RDC. The supreme court issued *Reata* after the parties' briefs were filed.

In *Reata,* a cable construction company obtained a temporary license from the City of Dallas to install fiber optic cable. *Reata Constr. Corp.,* —— S.W.3d ——, 47 Tex. Sup.Ct. J. at 408, 2004 WL 726906, at *1. The cable construction company subcontracted with Reata Construction Company for drilling. Reata inadvertently drilled into a water main, flooding a building. The building's owner sued the cable construction company and Reata for negligence. The tenants intervened, seeking damages. Reata filed a third-party claim against the City of Dallas, alleging that the plaintiffs' damages were caused by the City's failure to properly locate the water main. The City intervened asserting claims against the cable construction company. In its second amended plea in intervention, the City asserted a claim of negligence against Reata related to the flooding, and sought actual damages, interest, costs, and any other relief at law and equity to which it might have been entitled. *Id.*

Before trial, the City filed a plea to the jurisdiction asserting governmental immunity from suit with regard to Reata's claims against it. Among other arguments, Reata responded that "governmental immunity did not apply because the City subjected itself to jurisdiction by intervening in the lawsuit and seeking affirmative relief." *Id.* The trial court denied the City's plea to the jurisdiction, and an interlocutory appeal ensued. Pursuant to rule of appellate procedure 59.1, the supreme court delivered its opinion, agreeing with Reata and holding that "by filing a suit for damages, a governmental entity waives immunity from suit for any claim that is incident to, connected with, arises out of, or is germane to the suit or controversy brought by the State." *Id.* at —— at *3 (quoting *State v. Martin,* 347 S.W.2d 809, 814 (Tex.Civ.App.-Austin 1961, writ ref'd n.r.e.)). The supreme court reasoned that, if the City had filed an original petition against Reata for damages, "the filing of the suit would have waived the City's immunity from suit for Reata's claims against the City related to the flooding." *Id.* (citing *Kinnear v. Tex. Comm'n on Human Rights ex rel. Hale,* 14 S.W.3d 299, 300 (Tex.2000) (per curiam), and *Anderson, Clayton & Co. v. State ex rel. Allred,* 122 Tex. 530, 537, 62 S.W.2d 107, 110 (1933)). The supreme court concluded that the claims were clearly related since, to intervene, a party must assert claims for relief that arise out of "the same transaction, occurrence, or series of transactions or occurrences." *Id.* (quoting Tex.R. Civ. P. 40). Perceiving no difference be-

tween a governmental entity as plaintiff or as a plaintiff-intervenor, the court determined that "[w]hen the City filed its plea in intervention against Reata, it subjected itself to the jurisdiction of the trial court and waived its governmental immunity from suit with regard to Reata's claims germane to the matter in controversy." *Id.* (citing *Martin,* 347 S.W.2d at 814).

RDC argues that, because of the holding in *Reata,* we must conclude the City waived its sovereign immunity from suit respecting claims on the lease when the City brought an action for breach of the lease and past-due rents. RDC argues that its counterclaim is not outside of the trial court's jurisdiction since it is a claim that is "incident to, connected with, arises out of, or is germane" to the City's claim. *Id.* The City argues that we must focus on part of that descriptive phrase from the case law cited by RDC, that is, whether RDC's claim is "germane" to the City's claim. It is the City's position that a "germane" claim is one that is even narrower than a compulsory counterclaim and RDC's claim does not fit within that narrow classification.

The City contends that the cases relied on by the supreme court in *Reata,* in its statement of the standard, show that a "germane" claim involves offsets and defense matters rather than a counterclaim such as the breach of contract claim asserted by RDC. To evaluate the City's contention, we will consider carefully and in depth the definition of "germane" in relation to the *Reata* standard for waiver of immunity from suit, the circumstances of *Martin,* as well as the nature of the opposing claims in the other cases cited in *Reata* in support of its standard.

■ As the first step in assessing the City's argument, we consider the meaning of the word "germane" separate from the context of the descriptive phrase "incident to, connected with, arises out of...." Since the City does not cite, and our research does not reveal, prior caselaw in Texas defining the word "germane," we must determine its plain meaning. Our analysis is similar to the interpretation of words in written agreements. *See Pratt–Shaw v. Pilgrim's Pride Corp.,* 122 S.W.3d 825, 833 (Tex.App.-Dallas 2003, pet. filed) (stating general rule as to interpretation of written agreements that when words are not defined, court uses "plain, ordinary and generally accepted meaning attributed to the term or word"). To ascertain the plain meaning of words we may refer to dictionaries for assistance. *Id.* In common usage, the term "germane" means "closely akin" and "being at once relevant and appropriate," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 525 (11th ed.2004), and "closely or significantly related," "relevant," and "pertinent." RANDOM HOUSE UNABRIDGED DICTIONARY 800 (2d ed.1993). These common meanings of "germane" are even broader than the descriptive language used by the court in *Reata:* "incident to," "connected with," and "arises out of." We reject the City's argument that "germane" is distinguishable as being narrower than the other terms in the *Reata* standard.

Next, we examine the cases cited in *Reata.* In *Anderson, Clayton & Co.,* 122 Tex. at 537–38, 62 S.W.2d at 110, the State sought penalties and an injunction against a motor carrier and drivers for failure to obtain statutory permits. The defendants countersued for an end to the interference. After nonsuiting its claims, the State sought immunity from the countersuit. The supreme court stated the rule as to waiver of immunity from suit as follows:

> where a state voluntarily files a suit and submits its right for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove all matters properly defensive [in-

cluding] the right to make any defense . . . germane to the matter in controversy.

*Id.* The supreme court concluded that when the State invoked jurisdiction for "judicial determination of the question as to whether the defendants were subject to [the statutory provisions] and liable for the penalties described therein" and the defendants sought affirmative relief in a crossbill, jurisdiction could not afterwards be defeated by the State. *Id.* Accordingly, the district court acquired jurisdiction over the State officers named in the cross-bill. *Id.*

In *State v. Humble Oil & Refining Co.,* 141 Tex. 40, 45, 169 S.W.2d 707, 710 (1943), the State sued an oil company to recover taxes, and the company claimed an offset for overpayment of taxes in the previous year. Because the offset claim was for taxes owed for a different taxing period, the supreme court reasoned that the offset claim had "no connection with [State's claim for taxes], and the two claims [were] entirely independent of each other." *Id.* The supreme court announced that the rule stated in *Anderson, Clayton & Co.,* quoted above, did not apply.

In *Martin,* 347 S.W.2d at 810, the State sued Martin for specific performance of a contract for the sale of an oil and gas lease. Martin crossclaimed against the State and others for return of the money he paid to the State under the contract. The court of civil appeals rejected the State's contention that Martin's crossclaim was, in effect, a suit against the State to which the State had not consented. That court stated that Martin's right to defend the suit brought by the State included "the right to cross-claim and obtain affirmative judgment on such claim where the claim so asserted is incident to, connected with, arises out of, or is germane to the suit or controversy brought by the State." *Id.* at 814. Further, "[Martin's] claim to recover the very money which the State seeks to retain, the claim of each arising from the same single transaction between the parties, could not be more closely related or more germane." *Id.*

In *Kinnear,* 14 S.W.3d at 300, a state agency sued an individual for violating the Texas Fair Housing Act. The individual defendant filed a claim against the State for attorney's fees pursuant to the same statute. The trial court held that "[b]ecause the Commission initiated this proceeding under the Texas Fair Housing Act and Kinnear claimed attorney fees as a consequence of that suit, the jurisdictional question in this case [i.e., immunity from suit] was answered when the Commission filed suit. . . ." *Id.*

We do not read *Kinnear, Martin, Humble Oil & Refining Co.,* and *Anderson, Clayton & Co.* as narrowly as does the City. These cases do not direct us to limit the definition of "germane" to claims more narrowly related than compulsory counterclaims. Moreover, the result in *Humble Oil & Refining Co.,* where the court refused to find waiver, is distinguishable from the results in the other cases. As the supreme court said in *Humble Oil & Refining Co.,* the tax claim brought against the State was for a different year and was independent of the State's claim. In so deciding, the supreme court did not deviate from the rule in *Anderson, Clayton & Co.* Finally, and most importantly, the Texas Supreme Court tells us in *Reata* that, under *Kinnear,* "when a governmental entity files suit against a party, that entity waives, at a minimum, immunity for suit for counterclaims filed as a consequence of the suit." *Reata,* at ——, 47 Tex. Sup.Ct. J. at 409, 2004 WL 726906, at *2; *see IT–Davy,* 74 S.W.3d at 861 (Hecht, J., concurring) (citing *Kinnear* and *Anderson, Clayton & Co.* for the proposi-

tion that "it has long been held that the State can waive immunity by filing suit"). Accordingly, we conclude that the City's arguments are not supported by the plain meaning of the term "germane" or the law.

The City's and RDC's claims arise from the same transaction: the lease of Redbird Airport land and facilities. Thus, they are "germane to the matter in controversy" and "could not be more closely related." *See Reata*, at ——, 47 Tex. Sup.Ct. J. at 410, 2004 WL 726906, at *3 (city's intervention related to same flooding incident that was subject of original suit); *Martin*, 347 S.W.2d at 814 (defendant crossclaimed for money paid on contract for land that was subject of State's suit for specific performance); *see also* Tex.R. Civ. P. 40(a) (intervention authorized when party asserts claim which arises out of "the same transaction, occurrence, or series of transactions or occurrences"); Tex.R. Civ. P. 97(a). Resolution of the rights of the parties before us depends on facts pertinent to the parties' conduct regarding the same lease. We disagree with the City's assertion that a germane claim is narrower in scope than a compulsory counterclaim. It is clear that RDC's counterclaim is "compulsory" in that it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Tex.R. Civ. P. 97(a). As we observed above, RDC's counterclaim is germane to the City's claim. A compulsory counterclaim is germane to the opponent's claim by its very nature. Accordingly, we conclude that, by filing its suit for damages, the City waived immunity from suit for RDC's breach of contract claim because RDC's claim is "incident to, connected with, arises out of, or is germane to the suit or controversy brought by the State." *Reata*, at ——, 47 Tex. Sup.Ct. J. at 410, 2004 WL 72906, at *3. The trial court did not err in denying the City's plea to the jurisdiction. We resolve the City's first issue against it.

## LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE ON DAMAGES

In its second issue, the City argues that the evidence is legally and factually insufficient to support the award of $3 million in damages. Its arguments include those set forth in the briefs and others which the City espoused at oral argument. Specifically in regard to this point, the City contends (1) an offer by a third party to purchase the lease is no evidence of the fair market value of the lease; (2) RDC is not entitled to damages because there was no showing that RDC was profitable, nor was there evidence of the value of the lease to RDC, that is, that RDC ever made a profit on the lease; (3) testimony as to the value of the lease was speculative, conclusory, and no evidence; and (4) the damages are clearly excessive and unjust.

Jury Question 2 addressed RDC's damages for breach of contract:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate RDC for its damages, if any, that resulted from the City's breach of the 1999 lease?

In conjunction with Question 2, the jury was instructed to consider as an element of damages, if any, only "the value of the full term of the leasehold to RDC under the lease agreement" and that, in doing so, the jury could consider the fair market value of the lease. The instruction defined "fair market value" as

the price the property would bring when offered for sale by one who desires to sell, but is not obligated to sell and is bought by one who desires to buy, but is under no necessity of buying, taking into consideration all those uses to which it is reasonably adaptable and for which it

either is or in all probability will become available within the reasonable future.

### Applicable Law and Standard of Review

Market value is defined as "the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it." *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex.1977) (citation omitted). When the "comparable sales" method of appraising property is not useful, the income approach to value may be used. *Id.* The income approach to value proceeds on the premise that a buyer of income-producing property is primarily interested in the income which his property will generate. *Id.* This approach involves estimating the future income of the property and applying a capitalization rate to that income to determine market value. *Id.* (citation omitted). The capitalization rate may be defined as the rate of interest investors would require as a return on their money before they would invest in the income-producing property, taking into account all the risks involved in that particular enterprise. *Id.* (citation omitted).

When reviewing a legal sufficiency or no evidence issue, we consider the evidence in the light most favorable to the challenged finding, disregarding all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001). The evidence is legally sufficient if more than a scintilla of evidence supports the finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998).

When reviewing a factual sufficiency issue, we examine all the evidence, setting aside the jury's finding only if the evidence is so weak that the finding is clearly wrong and manifestly unjust. *Rosell v. Centr. W. Motor Stages, Inc.*, 89 S.W.3d 643, 659

(Tex.App.-Dallas 2002, pet. denied). The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Tanner v. Karnavas*, 86 S.W.3d 737, 745 (Tex.App.-Dallas 2002, pet. denied).

### Discussion

#### a. Value Testimony

RDC relied primarily on Tennell Adkins, president of RDC, to present damages evidence. Adkins testified that the Redbird lease was worth between $3 and $5 million. He reached this conclusion by calculating that the lease produced an annual income of $250,000, to which he applied a discount rate of five to eight percent over the term of the lease. He testified that he received an offer to buy the lease for $3.5 million, which he turned down. Also, he testified that he calculated RDC's annual income from the lease at $250,000 per year by estimating the "net cash income flow" at thirty-four cents per square foot, which he arrived at by comparing the quality of the Arlington and Addison airports, and their rental rates, to Redbird. Next, Adkins testified that the estimated rental income for the airport was $44,000 per month and that his monthly rent payable to the City was $13,200. He told the jury that the airport facilities were ninety percent occupied, although he admitted that not all occupants were paying rent. Also, he admitted that his figures did not show deductions for expenses such as insurance, although he testified that he intended that utilities and any capital improvements would be paid for by tenants through a rental increase.

#### b. Specific Analysis of Legal Sufficiency

As described above, the City argues that the evidence is legally insufficient. RDC responds by saying that the City failed to preserve its legal sufficiency issue because

it did not move for instructed verdict, for judgment notwithstanding the verdict, or to disregard the jury's answer to Question 2; did not object to the submission of the damages issue; and argued in its motion for new trial that RDC's evidence was "insufficient" because it was defective and incomplete, not that it was legally insufficient. *See Cecil v. Smith,* 804 S.W.2d 509, 510–11 (Tex.1991).[1]

The City contends its point is preserved. Relying on *Coastal Transport Co. v. Crown Central Petroleum Corp.,* 136 S.W.3d 227, 233 (Tex.2004),[2] the City argues that its legal sufficiency or no evidence challenge is, in substance, that the evidence is speculative and conclusory, i.e., on the face of the record, the evidence lacked probative value. The City asserts that such an objection, which may be raised for the first time on appeal, is distinguishable from a challenge to the methodology, technique, or foundation data, which requires a timely objection to give the trial court an opportunity to perform its gatekeeper function and determine the reliability of the testimony.

 We do not agree with the City that *Coastal Transport* applies here. In *Coastal Transport,* the defendant/appellee preserved its legal sufficiency complaint by moving for a directed verdict. The trial court granted the motion. Since the issue was properly preserved, the supreme court determined whether a failure to object to the admissibility of expert testimony waived any complaint that the testimony had no probative value. Although *Coastal Transport* addresses a substantive no evidence challenge to an expert opinion, it

does not change the long-standing procedural rules as to preservation of legal sufficiency challenges on appeal. *See Cecil,* 804 S.W.2d at 510–11. As accurately noted by RDC, the City did not preserve a legal sufficiency point.

We reject the City's reliance on *Coastal Transport* as authority that it was not required to raise its legal sufficiency challenge in the trial court to preserve its complaint on appeal. The City's arguments as to methodology, technique, or foundation data and speculation are not preserved. Accordingly, we need not address the City's legal sufficiency arguments.

### c. Specific Analysis of Factual Sufficiency

 In addition to testimony from Adkins, the jury heard testimony from the City's expert. He testified that RDC had a history of losses, not profits, and that Adkins's estimate did not account for any expenses other than rent due the City or for any improvements required under the lease. However, Adkins's testimony related to an income approach to market value as the measure of damages, not lost profits. Specifically, he projected a "net cash income flow" on a square foot basis which was annualized for the entire property. There was no testimony as to what, if any, profit RDC had made on the lease or otherwise. As noted above, any complaints that RDC did not prove lost profits and that its calculations were deficient by failing to include deductions for expenses and costs are attacks on the methodology, technique, or foundation data, which the City failed to preserve for review.

1. *Cecil* provides that no evidence issues "may be raised by either (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue or (5) a motion for new trial." *Cecil,* 804 S.W.2d at 510–11.

2. *Coastal Transport Co.* was decided after the parties filed their briefs in this case.

Moreover, Adkins testified to facts which he tendered to support his conclusions and opinions. The jury had to sort out the evidence. It is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Tanner;* 86 S.W.3d at 745. After reviewing all the evidence as to damages, we cannot conclude that the evidence is so weak that the jury's finding is clearly wrong and manifestly unjust. Accordingly, we conclude the evidence is factually sufficient to support the jury's finding as to damages. We resolve the City's second issue against it.

## SEVERANCE

In its third issue, the City argues that the trial court abused its discretion in severing FRDC from the suit because the City alleged FRDC was the alter ego of RDC, and severance divided a single cause of action.

*Applicable Law and Standard of Review*

Rule of civil procedure 41 provides that "any claim against a party may be severed and proceeded with separately." Tex.R. Civ. P. 41. A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim does not involve the same facts and issues. *Saxer v. Nash Phillips–Copus Co. Real Estate*, 678 S.W.2d 736, 739 (Tex.App.-Tyler 1984, writ ref'd n.r.e.). The purpose of granting a severance is to ensure justice is done, prejudice is avoided, and convenience is furthered. *Id.* The trial judge is given broad discretion in ordering a severance, and the order will not be overruled absent an abuse of discretion. *Id.*

*Discussion*

The City's third amended petition alleged that RDC and FRDC were "alter egos" and "one and the same." The City alleged that the companies had switched names, beginning in 1997, and the same persons were owners and officers of both companies at certain times since 1997, and this "blurring of identities" was used as a sham to perpetrate fraud and avoid liabilities. The City alleged that, had it sued only RDC, the company could have changed its name to FRDC, as it had in the past, and avoided liability in this case.

The record shows the lease was between the City and RDC. There was testimony that the former president of FRDC, Gayle White, would be a witness in the suit, but that the acts of RDC, not FRDC, would determine the outcome of the breach of contract claims. Counsel for RDC stated that no objection would be made to any evidence on the alter ego claim. Counsel for RDC also stipulated that "if FRDC ever gets hit with a[j]udgment, we'll pay it." The jury heard evidence that George Day formed FRDC to take RDC's name after RDC failed to pay its franchise taxes in 1997. There was evidence that this was a fraud that Day perpetrated on other companies. The City represented that it had sued FRDC because FRDC had assumed the lease from RDC without the City's permission, thus constituting a breach of the lease by RDC, but the City did not allege wrongful conduct by FRDC directly against the City.

First, the City argues the severance was "manifestly unjust" because the City did not have sufficient time to prepare for trial and change its presentation of its case. However, the record shows that over three years elapsed between the filing of the City's original petition and the trial. The City points to no facts showing prejudice from insufficient preparation. The City does not point to any evidence it was unable to present evidence regarding

FRDC's connection to RDC and the lease. Moreover, the charge submitted a question labeled "City's Claim of Alter Ego," which asked, "Is RDC responsible for the conduct of [FRDC]?" The question included an instruction regarding whether there was a "unity between the corporations." The City did not object to this question, and, because it was conditioned upon the answers to prior questions, the jury did not answer it.

Second, the City argues that because of the severance, RDC was able to argue that all "misrepresentation" was due to FRDC. However, the City's record references relate to "name switching" between RDC and FRDC as the history of Day's fraud on Adkins and RDC, not as to any "misrepresentation" in the management of the lease.

Finally, the City argues that it may be precluded from litigating any case with FRDC because of the result of this case, cutting off the City's claims against FRDC. However, in light of the City's failure to challenge the jury's finding that RDC was not liable for breach of the lease, the City has no claim against FRDC as "one and the same" corporation as RDC for breach of the lease.

We conclude that the City failed to show an abuse of discretion in the severance of FRDC. Accordingly, we resolve the third issue against the City.

## DISQUALIFICATION

In its fourth issue, the City argues that the trial court abused its discretion in denying the City's motion to disqualify RDC's counsel. The City contends that counsel should not have been permitted to continue representing RDC after withdrawing from representation of FRDC because such representation was a conflict of interest in violation of the Texas Disciplinary Rules. The City also contends that

FRDC did not consent to counsel's continued representation of RDC after counsel withdrew from representing FRDC.

### Applicable Law and Standard of Review

 "Disqualification is a severe remedy." *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex.2002) (orig.proceeding) (quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex.1990)). It can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice. *Id.* In considering a motion to disqualify, the trial court must strictly adhere to an exacting standard to discourage a party from using the motion as a dilatory trial tactic. *Id.* A court often looks to the disciplinary rules to decide disqualification issues. *Id.* However, the disciplinary rules are merely guidelines—not controlling standards—for disqualification motions. *Id.* Even if a lawyer violates a disciplinary rule, the party requesting disqualification must demonstrate that the opposing lawyer's conduct caused actual prejudice that requires disqualification. *Id.* (citing *In re Users Sys. Servs., Inc.*, 22 S.W.3d 331, 336 (Tex.1999)). Under appropriate circumstances, a trial court has the power to disqualify a lawyer even if the lawyer has not violated a specific disciplinary rule. *Id.* We review a trial court's ruling on a motion to disqualify under an abuse of discretion standard. *Henderson v. Floyd*, 891 S.W.2d 252, 254 (Tex.1995).

### Discussion

After admitting a conflict in representing RDC and FRDC, counsel withdrew from representing FRDC, but continued to represent RDC. The City contends that disciplinary rules 1.06(d) and 1.09(a)(3) prohibit counsel from representing RDC in the same matter in which counsel represented the former client, FRDC, without

the former client's consent. Rule 106(d) provides

A lawyer who has represented multiple parties in a matter shall not thereafter represent any of such parties in a dispute among the parties arising out of the matter, unless prior consent is obtained from all such parties to the dispute.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(d), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G App. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9). Rule 109(a)(3) provides:

Without prior consent, a lawyer who personally has represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

\* \* \*

(3) if it is the same or a substantially related matter.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(a)(3).

 Counsel's motion to withdraw stated that counsel elected to withdraw from representing FRDC and to continue representing RDC, with both clients' agreement. As president of FRDC, Gayle White signed a "client consent" as part of the motion, agreeing to counsel's withdrawal. Moreover, FRDC was no longer a party to the suit after the severance, and there is no dispute here "among the parties," that is, among FRDC and RDC. *See In re Roseland Oil & Gas, Inc.*, 68 S.W.3d 784, 788 (Tex.App.-Eastland 2001, orig. proceeding) ("The 'same' matter generally prohibits an attorney from switching sides *in a lawsuit* and representing another whose interests are in conflict with those of the former client." (Emphasis added.)). Accordingly, we reject the City's argument that counsel for RDC violated the disciplinary rules by continuing to represent

RDC in this suit. We resolve the City's fourth issue against it.

## POSTJUDGMENT INTEREST

In its fifth issue, the City argues that the postjudgment interest should be reduced because a 2003 amendment to section 304.003(c) of the Texas Finance Code that reduced the minimum postjudgment interest rate from ten to five percent applies here.

In both House Bill 4 and House Bill 2415, the 78th Legislature amended section 304.003(c) of the Texas Finance Code to reduce the postjudgment interest rate from ten to five percent. *See* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, sec. 304.003, 1997 Tex. Gen. Laws 3091, 3435, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.01, 2003 Tex. Gen. Laws 847, 862 [H.B. 4], and Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096, 2096–97 [H.B. 2415] (current version at TEX. FIN.CODE ANN. § 304.003(c) (Vernon Supp.2004)). Each bill provides that the changes made apply in cases "in which a final judgment is signed or subject to appeal on or after the effective date of this Act." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.04, 2003 Tex. Gen. Laws 847, 862 [H.B. 4]; Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a), 2003 Tex. Gen. Laws 2096, 2097 [H.B. 2415].

In *Columbia Medical Center of Las Colinas v. Bush ex rel. Bush,* 122 S.W.3d 835, 865–66 (Tex.App.-Fort Worth 2003, pet. denied), the Fort Worth Court of Appeals interpreted the phrase "signed or subject to an appeal on or after the effective date of the Act." Applying the plain meaning of this phrase to discern the intent of the legislature, the court concluded that the amendment applied to cases where a judgment is signed on or after the effective date of the act and "to cases where a

judgment becomes subject to appeal, i.e., capable of being appealed, on or after the effective date of the Act." *Id.* at 865.

■ We assume, without deciding, that the effective date of the amendment of section 304.003(c) is June 20, 2003, as the City argues.[3] The trial court signed the final judgment on May 16, 2003. Thus, it was "capable of being appealed" on May 16, 2003, which is before, not "on or after," June 20, 2003. *See id.* Accordingly, we resolve the City's fifth issue against it.

## CONCLUSION

Because we have resolved the City's issues against it, we affirm the trial court's judgment.

---

**3.** *See Columbia Med. Ctr.,* 122 S.W.3d at 864 n. 12 (noting H.B. 4 effective September 1, 2003, and H.B. 2415 effective June 20, 2003). Because appeal of this case was pending on September 1, 2003 (the notice of appeal having been filed July 30, 2003), the City's argument fails if the effective date of the amendment is September 1. *See CIGNA Healthcare of Tex., Inc. v. Pybas,* 127 S.W.3d 400, 421 (Tex.App.-Dallas 2004), *judgm't vacated & case dism'd pursuant to settlement,* 2004 WL 585008 (Tex.App.—Dallas Mar. 25, 2004, no pet.) (mem. op.).